Good morning, your honors. May it please the court, my name is Todd Master. I'm appearing on behalf of the appellants, Brian Leventhal, the city of Montecerino, and council members Wright, Garner, Brockstein, Baxter, and Nesbitt. When this case is brought back to its grassroots, the case is relatively simple and the evidence, as opposed to the innuendo and the argument, supports one conclusion, even considering all reasonable inferences, and that conclusion is that the appellants are entitled to judgment as a matter of law. There are many issues addressed to the court, just by view of the amount of paper that the court received in this case, but I'd like to focus on really what I believe are the central themes of the case. And the first theme of the case deals with the equal protection claim of the Padgetts. That claim was brought against Mr. Leventhal in the district court. The evidence at trial was that Mr. Leventhal interpreted and enforced the city's fence ordinance equally as against the Padgetts. The evidence at the trial proved that Mr. Leventhal interpreted and applied the city's fence ordinance equally, both before the Padgett fence came to the city's attention. In fact, the evidence at trial was that every fence that was brought to the attention of the city, and as indicated in the brief, when we talk city, that's a term of art here. This is relatively a very small town with a very small staff. But every fence that was complained about to the city and that the city investigated that was taller than six feet and which was constructed at a time when the law was in place, in effect, the city enforced against those fences. Did the city have a variance procedure? Yes, Your Honor. And that was available to the Padgetts at this time? That's correct, Your Honor. Were they ever informed of that? Your Honor, I'm not sure, to be perfectly honest with you. What I do understand, I know during the code enforcement action that was discussed, but it is clearly set forth in the municipal code on what the procedures are to get a variance to any particular ordinance. And that was not done here. Your Honor is correct. Had they decided that they wanted to build a fence in violation of the code, the proper step is to go to the city, go to the site and architecture. It wasn't actually the fence, was it? It was the trellis? Well, Your Honor, the fence, there's a fence and a trellis. The city looks at that as a fence. Without the trellis, the fence is compliant? Correct. Mr. Loventhal's Rule 50A motion did not make any arguments regarding First Amendment claims against him. So his standard now is under the more onerous plain error, is that correct? No, Your Honor, it's not. With respect to what was argued in the 50A motion, and I regret that it was not more specifically argued. Well, it wasn't. Tell me how you think you made the First Amendment claim. I'll be happy to do that, Your Honor. That has to do with every other item of evidence and argument that was presented to the district court on that particular issue. We actually cited in the brief to the district court judge actually advising the Padgett's attorneys that they needed, that the court needed to hear more evidence as to the First Amendment claims by the Padgetts as against Mr. Loventhal and Mr. Wright. Importantly, also, Your Honor, is the fact that in the Padgett's oral opposition to the oral 50A motion, they specifically talk about the First Amendment. So they were aware of it. In addition to that ---- Tell me the point somewhere in the record where you think you make of the appropriate 50A motion regarding the First Amendment claim against him. Sure, Your Honor. If you – if the Court were to look at the oral argument of Plaintiff's counsel, the Padgett's counsel, in response to the ---- Oral argument at the – during the Rule 50 motion? Correct, Your Honor. Okay. Go ahead. In addition to that, if the Court were to also look at ---- Where page is that in the record? I don't have the record with me, Your Honor. I apologize for that. It's at the same discussion point, obviously, where the city, on behalf of Mr. Loventhal and Mr. Wright, are arguing the 50A motion is within that same ---- Has it been in three volumes of excerpts for the Court to read? No, Your Honor. It is specifically identified in our brief. No. I'm asking, you provided the Court, the parties provided the Court with three volumes of excerpts? My client did not, Your Honor. My client provided ---- How many did you provide? We provided 16 volumes. Sixteen volumes? Correct. And you brought none of them? No, Your Honor. I figured with a 20-minute discussion we wouldn't have time to get into these particular excerpts of record. Okay. It is specifically cited in our brief, Your Honor. And to further answer your question, if the Court were to look at the supplemental excerpt of record, tab 49, at pages 3279 through 3295, at that point, the Padgett's actually filed a written opposition to our Rule 50A motion. Upon looking at that opposition, they argue not only the First Amendment, but that Rule 50A motion, albeit brief, satisfied the purpose and the scope behind Rule 50, as identified in our brief. Assuming we disagree, then you understand it's going to be under the more bonerous plain error standard, correct? Yes. I believe so, Your Honor. All right. I'd like to talk about Nunez. And you rely on Nunez for the claim that speech in response to speech is not enough. I mean, I don't know if that's fair, to constitute an adverse action for First Amendment retaliation. I'm just — would like your view if Nunez is still good law after Cole's alter. Your Honor, I believe it stands for the proposition that, and persuasive with respect to this particular issue, that an individual who uses their own First Amendment rights, as Mr. Leventhal and as Mr. Wright did here, cannot violate someone else's First Amendment rights. I believe it stands for that proposition. Kind of a curious exercise of First Amendment rights, isn't it? I'm sorry, Your Honor? Kind of a curious exercise of First Amendment rights, isn't it? But, Your Honor, I think that, you know, that lies in the eye of the beholder as to what a particular person and why a particular person chooses to exercise the First Amendment rights. Well, but this — this right can't include an unfettered right to violate the constitutional rights of citizens. That's correct, Your Honor. And the facts of this case, once again getting back to the evidence and the facts, is that this case boils down to people downloading and distributing copies of a public, wildly circulated newspaper article from the San Jose Mercury News. Well, how do we balance these interests? I mean, that's really what the crux on Mr. Wright's motion that we have to figure out. So how do we balance these competing interests? Sure, Your Honor. And I think the competing interest here is looking at really the second element of the First Amendment claim, and that is, does this adverse action, if you're even going to assume it's an adverse action for the sake of argument, would it chill a person, an ordinary person, from speaking out? The evidence in this particular case, and it can be narrowly tailored to this case, Your Honor, is that this public record, this newspaper article, was never distributed to the pageants by Mr. Wright or Mr. Leventhal. Now, the clerk sent it over with a threatening no, right? Yes, Your Honor. The clerk did that. And the evidence at trial is that clerk did that on her own. And that was undisputed. How did she find out about the article? Mr. Leventhal, after receiving multiple complaints from not just city staff but from residents in the community about Mr. Padgett's behavior, downloaded the newspaper article, read it, and upon reading a particular paragraph in that article which talked about Mr. Padgett's potential for doing dangerous physical harm, decided it was in his interest as a city manager and the interest of his employees to share that information with his staff. By sharing that information, that doesn't necessitate personal participation. Looking at the Huffman case, I think we talk about that case in our brief dealing with State action, but also dealing with personal participation. Assuming Mr. Padgett was unaware of Mr. Wright's distribution and what he did with the article, why should that allow Mr. Wright to avoid liability? Sure, Your Honor, because Mr. Wright did what anybody in this room could do without violating the law. And it's reasonable to think that reading a newspaper article, and keep in mind that this newspaper article. I mean, but the fact that Mr. Padgett didn't know about it. Well, that's important because you can't have a violation of First Amendment rights and you can't chill an ordinary person in terms of their ability to speak out if they're not aware of it. But what if he'd given that to a potential employer or he disseminated so much to everybody he may not have known, but he couldn't get a job because of it? On those facts? Yes. I mean, I'm just trying to figure out if what you're saying that the fact that alone Mr. Padgett or that that's significant that Mr. Padgett didn't know. I think, Your Honor, that that's an interesting point, and that is if hypothetically this article would have been given to an employer, Mr. Padgett, and that employer would have directed it to Mr. Padgett and terminated him, then that would certainly be an adverse action. So how about just not hire him? Well, how would Mr. Padgett be aware of that? Well, I'm just saying that so that means Mr. Wright can do that and there's no problem. Well, there's no problem in sharing public information. I mean, I will stand for it. I'll stand by that proposition. Isn't that what blackmail is? No, Your Honor. Blackmail, I believe someone has to be aware of the, of the, and I'm not, I'm not a definitive source. If you're aware of information that you're free to disclose, but then you say give me money or I'll disclose information or I'll send it around to the community, it doesn't really matter whether the information, you know, somebody else could get it a different way, right? I mean, it's still blackmail. I believe so, Your Honor, but these facts don't, don't account for that. That's not what happened here. What happened, and I think it's important to note. Well, what happened is Wright found this information and passed it on to a, to a, to a journalist, right? Yes, but there's no evidence that that journalist ever republished it. It was also passed along to a neighbor, right? Correct. Who, at the time, was supporting the Padgett's. Yes, Your Honor. In their dispute with the city. Yes, Your Honor. What was the purpose in doing that? Mr. Wright testified the purpose in doing that is he knew that the neighbor, Ron Schindler, was a former police officer, and upon hearing about Mr. Padgett's history, thought he might be interested to know about his history. Come on. I'm sorry? Come on. That's, that's, that's not. That's precious credulity. But, Your Honor, it seems to me that Mr. Padgett's testimony is not enough to convince him not to continue to support the Padgett's. There's no way. It would be obvious. Isn't that what the jury found? No, Your Honor. My argument is that if that would have been, and even assuming that's the case. I'm sorry. How can you say no? I'm sorry? How can you say no? Because he didn't include a note. He didn't include anything about it. He didn't say that, hey, this is something you need to pass on. You need to look at. That's not how we look at jury verdicts. We look at jury verdicts and ask, based on the evidence, what are the influences that could reasonably have drawn? And isn't this the inference that the jury could reasonably, must reasonably have drawn in order to find liability here? Well, Your Honor. Isn't that a reasonable inference that, you know, he was passing information around to try to undermine the pageants in their political campaign? Well, I would respectfully disagree. You know, the campaign about the fence. Well, I would respectfully disagree with that, Your Honor, simply from the point of view of looking at the procedural and the history of when information was passed, looking at the time frame here. When the pageants spoke out, Mr. Wright did not have any conversations with Mr. Pageant. Then after he spoke to him and suggested that he might want to take a look at Mr. Pageant online, he waited another three months to even ask for his. To make sure that he retrieved the information, when he found out he hadn't retrieved the information, which was from a paid site, right? Yes, that you or I. The average person trying to get into this information couldn't get it without paying a fee. You're right, but Your Honor. But once it was Mayor Wright, correct? I'm sorry? He was the mayor of this. At the time, he was. It's a rotating position. So when he found out that the neighbor hadn't uncovered this information, he provided it to him as a public service? No, Your Honor, not as a public service. It had nothing to do with him as a mayor or as a council member. And I think the point here, and this gets back to the ---- Was it a purely personal matter? Yes. The action on his part? Yes, it was. In this case ---- Personal? Yes, Your Honor. I would argue that, because if one ---- His only intention, even given the jury verdict, was to ensure that the public was well informed. Not the public, Your Honor. One individual. But the neighbor who was supporting the fadges. Well, I don't ---- you know, that might be the case. But in terms of whether or not this was done as a State action, we'd argue the Huffman case and that it's not. And that whether you or I have an idea, or a like or a dislike for somebody, or an idea that we want to provide additional information to someone, without more, it's not a violation of someone's First Amendment rights. I think it comes back to what Your Honor was discussing, and that is ---- That's an awful lot of the kind of thing you argue in the jury when lost. We now have a jury verdict. The jury found ---- I mean, it was probably instructed on this point, and it found that he was acting in his pursuant of his official status. Isn't that what we must infer from the jury verdict? Well, I ---- Must we not also infer from the jury verdict that he did it in order to undermine the fadges politically? Your Honor, that may be the case. But the case, the Court, as you know, needs to look at this de novo. And I'd argue also as part of our Rule 59a motion ---- We don't look at this de novo. We've got a jury verdict. And what you're arguing is your position is that whether done out of the goodness of his heart or in the exercise of his First Amendment privilege or to make sure that people were informed about this, a jury came to a different conclusion. They inferred, as I think most rational people would, that the purpose in doing this was to undermine the pageants' efforts against the city regarding the wall. Your Honor, getting back to Your Honor's question, though, it's very important to look at how the information was delivered. The information was delivered without note, anonymously, in a mailbox, simply a newspaper article without anything more. The testimony, the evidence was ----    It's an open and transparent case. And the question is, do you accept that in the hope that the neighbor would not know who dropped it off? It doesn't matter, Your Honor. It doesn't matter what the subjective intent is of Mr. Wright. It matters as to whether or not a person of ordinary firmness would be chilled by the, quote, unquote, adverse action taken against him. Mr. Padgett was never aware of an adverse action against him. A person who is not aware of an adverse action can therefore not have their speech chilled by such action. And in this particular instance, as I mentioned briefly before, it was dropped off anonymously. The evidence was that Mr. Schindler, while he might have had an idea who might have dropped it off, did not know. And more importantly beyond that is that Mr. Schindler did absolutely nothing with that information. It was not republished any further. It was nothing more than simply handing it to somebody else and then putting it in a drawer. That's basically what happened in this particular instance. And to hold Mr. Wright liable for violation of the First Amendment rights is a slippery slope dealing with all public officials in terms of reading a newspaper article about a particular person, passing that on, and then that person being able to bootstrap the fact that at some point prior to that, he had critiqued the town in some fashion or the city in some fashion. Now you have a First Amendment violation. If Mr. Wright is held liable for simply doing nothing more than providing a public newspaper article, then public officials' speech is curtailed much more and is curtailed in violation of the First Amendment. You've got three minutes left. Okay. With the equal protection, I briefly discussed that. The Rule 50A motion, Your Honor, as I indicated before, it's important to look at the purpose behind Rule 50. The purpose behind Rule 50 is so that the court and the opposing party understand what the issues are and what the deficiencies are in a particular case. Those – that information was readily available and known by both the court and by the pageants in looking at not only the oral argument, but subsequent to that, their own written opposition, which clearly indicates that they understood what the issues  were. With respect, briefly, the motion for new trial of Mr. Wright, Your Honors, Mr. Wright contends that the instruction on the First Amendment violation was unnecessarily overbroad and did not specifically identify exactly how a jury was supposed to look at it. The instruction simply said a direct – an act directed at someone, not an adverse act. It didn't use the terminology from the case law. It said an act directed at someone. Well, an act directed at someone could mean any number of things, both adverse and positive. And I think given that, it was overbroad and the jury had to have been confused as to what they were supposed to be doing. And with that, Your Honor, I would like to reserve a couple of minutes for rebuttal if necessary. Thank you. We'll hear from this side. Good morning, Your Honors. Jeff Callis for the Padgets, dealing with the appellate appeal by Mr. Masters and Mr. Berkey for the appeal by the Padgets. I'd like to start with a very simple statement about the Schindler letter or the Schindler visit. Mayor Wright went up to Mr. Schindler's home as mayor to talk to him about a construction project. Mayor Wright investigated Mr. Schindler and determined he was a policeman. Mayor Wright then handed or told Mr. Schindler that he needed to know about this other policeman. Later on, he slips a note into a mailbox. And the law is fairly specific in that it says you want to ask but for. But for, Mr. Padgett asks, would Mayor Wright have done these things? And the answer, I think, is intuitively obvious. He wouldn't have. Why would he? What if what Mayor Wright put in the mailbox were newspaper articles about, and this is a hypothetical question, about the Padgets having disputes with other municipal governments involving their house over time? They had lived in City A, City B, City C. And in every one of those cities, they had some beef with the city, and there were newspaper articles about it. And he provided that information. Would that provide a cause of action? Well, Your Honor, I think in that case, you'd have to look and say the Padgets are complaining about city conduct. What he put or distributed had to do with complaints about city conduct. They are directly related. And since they're directly related, dealing with the same issues, I don't believe it really would create a cause of action. But when you turn around What makes this different? Well, the difference is that in one situation, the politician By hypothetical, the newspaper articles about their prior beefs with various city governments is in newspaper articles that are publicly available, and it's accurate in the hypothetical that this actually happened. Well, and as I said, I don't believe that would create a cause of action. I don't believe that that would be inappropriate because The place you would have us draw the line is if the information is scurrilous. Yes, sir. And I think there's a case It doesn't matter if it's true or not. If it's scurrilous, it's a problem. It matters if it's true in terms of libel or slander. The intent of the individual to defend themselves against a particular public accusation with relevant information for that accusation differs than presenting correct information on a totally different area. There's a case that deals with that from the circuit, Copley v. Hobbs. It's slightly different, but true information was given to a tribunal concerning a potential bias by an administrator who heard some intermediate disputes. The information that was given, however, related to problems that his children may or may not have had with the police. It was designed to show bias. And in Copley, the Court very simply said, hey, you went too far. It wasn't directly on point. It wasn't relevant. You used his children to try and smear them. And that was all the information you gave was accurate. It was irrelevant. And the Court held that Mr. Copley had a cause of action. I'm sorry. I just want to make sure I understand your position and your response as to why wasn't Mr. Wright exercising his own First Amendment right when he distributed this article to others. So you're saying it wasn't because it was they put Mr. Padgett in a bad light? No, Your Honor. The issue that I'm trying to lay out. Just answer my question. It was to change the topic. It was to alter the ---- But why wasn't Mr. Wright just exercising his own First Amendment rights? Because he was acting as mayor. So when you're a mayor or a public official, you can't do that? Well, when a mayor takes information they receive from a confidential closed session. Information. He got this off the Internet. No, he didn't. Mr. Wright got this information initially from Mr. Leventhal, who brought it to a closed session of the city council. But Mr. Leventhal got it off the Internet. That's correct. Okay. Is there any difference if Leventhal had walked in with a copy of an actual print copy of the San Jose Mercury News, would it be any different? The answer is no. I think I would have to say the answer is no. Mr. Wright could have gotten it. He just happened not to get it, but he could have gotten it and given it to someone else. I'm just trying to figure out why he wasn't exercising his own First Amendment right, and you're telling me that because he's mayor and how he got this is what distinguishes this. If I may, Your Honor, I'll try to answer that. Yes. Sequentially. Number one, the article was procured using city funds by Mr. Leventhal. Number two, Mr. Leventhal procured the article in his official capacity as city manager. Number three, Mr. Leventhal scheduled a closed session of the city council to present the article, which had nothing to do with litigation. And the closed session under the Brown Act was based upon a litigation strategy. They reported no action was taken. Mr. Leventhal then, after showing the articles, testified he destroyed them. Mr. Padgett then goes into the city hall or city council and points out Mr. Wright's house and many others are not in compliance. That was that city hall identification was September 16th. And on September 24th, Mr. Leventhal downloaded the article for Mr. Wright. Mr. Leventhal downloads the article for Wright immediately after Wright's house is shown. Wright went in and asked for it. Suppose at the city council meeting, and this is another hypothetical. Mr. Padgett is there. He's making his plea on behalf of his defense and pointing out the things you've described. And during an open session of the city council, the mayor had said, you know, Mr. Padgett, I think it's really important that my colleagues on the council and the people in the You're a former police officer, aren't you? Yes. And you were fired, weren't you, because of sexual improprieties from a police department? Would that generate a cause of action? It would be, I think, the same sort of attempt to chill speech. It's not related in any way to the issue in front of the city council. If I were to ‑‑ if I were speaking in front of the city council, and I'm talking about unreasonable enforcement of an in‑law building, and somebody on the city council said to me, well, Mr. Kallis, isn't it true that you committed adultery in 1973? That would be for the ‑‑ it may be true, but the purpose would be to chill my speech. And intent is part of the analysis of the First Amendment attempt to spill cheese ‑‑ to spill cheese. I'm sorry. We'll try that again. Intent is an element of that claim. Mendocino Environmental Center v. Mendocino County, F464, makes it clear. The defendant's intent is an element of the claim. Mr. Wright's ‑‑ or the city council's intent is ‑‑ I understand your position as long as it's, A, unrelated to what the individual is bringing before the city government, and, B, the intent is to chill speech. That's enough. And there's another step you have to take, and that is, but for the speech on the part of the person in front of the city council, the action bringing up the adultery would never have occurred. So if what the mayor said in our hypothetical city council meeting was, by the way, Mr. Padgett, you're a Democrat, aren't you? And Padgett says, yes, I've been a Democrat all my life. I think it would depend whether you're in a red or blue state. The defendant's intent is unrelated to what he's presenting to the city council and intended to lessen his ability to convince his fellow Republicans on the city council. If the ‑‑ if it was done because ‑‑ That's a free speech violation. In that case, I would say it's borderline. How do you distinguish this case from Nunez? I'm sorry? How do you distinguish this case from Nunez? Well, I'm glad you asked that. Nunez is an employment case. And in an employment case, you have to have a direct adverse action against the employee. That's not the case in freedom of speech. In freedom of speech, what you have to have is an action that would chill a reasonable person's speech. It does not need to chill the speech of the specific individual. And I think ‑‑ I believe that issue was brought up in ‑‑ and I'm sorry for having to look. But Nunez says if the only retaliatory action is speech, that's not enough. And you're saying because it was an employment case, that makes that different? Well, sure. If an employer says, I don't like what you're doing or what you're saying, and if you keep it up, I'm going to do something about it, that's a speculative action. There's not ‑‑ no damage has been done yet. On the other hand, when someone turns around and says, I don't like your political speech, the most protected speech there is, and then makes statements to deter and to deflect what you are saying, that is intending to chill. Well, what's more protective, you know, political speech or being able to discuss a newspaper article? Your Honor, if the newspaper article is relevant to the topic at hand, I think it's protected. If it's being used to undermine and to change the topic and to create an animus towards a particular person making the speech, then I think it is incorrect. In response to the motion to strike, you withdrew a number of exhibits without explanation. I was curious why that occurred. Again, Your Honor, I'm sorry. I can't hear you. In response to the motion to strike, you withdrew a number of exhibits without any explanation at all. It was in response to the motion to strike. We looked at the exhibits carefully. We agreed that there was, in fact, a basis for removing those, and we saw no reason to take up more of the Court's time in opposition or other papers, simply moved to remove them from the record. So you didn't realize they shouldn't have been there in the first place? I mean, just it's a lot of cost. I mean, there's a sanction on the circuit for that, and I'm just trying to figure out why that was done. Your Honor, mistakes occur. This was a mistake. We recognized it immediately. And once we recognized it, we acted in such a way as to mitigate whatever error there was. I asked Mr. Master about the Rule 50a motion and whether or not Mr. Lowenthal properly preserved his motion. What's your response to that? If you're asking specifically with Mr. Lowenthal, I would ask Mr. Berkey to respond to that. If you're talking in general, I feel I could respond to it. Which would you like to know? Well, I'm not sure I understand the difference. I'd like to know the answer to my question. Your Honor, may it please the Court, Stephen Berkey appearing on behalf of the Padgetts. With regard to the motion, the first time that there's been any argument as to whether or not there was an opposition made or that there was no prejudice made to the plaintiffs because the defendants did not actually state the First Amendment. Why don't you sit down, Mr. Cowles? Thank you, Your Honor. Our position on the Rule 50 is that the Rule 50 procedure under the Federal rules is clear, that you actually have to state a fact, you have to state evidence, and you have to say what the actual cause of action or theory of defense. You're talking in generalities. Why don't you be specific? Sure. In this specific instance, in the supplemental excerpt of the record, which is at tab 68, 3545 to 3547, and also at tab 68, page 2713, there is no place in the record where the defendants described the First Amendment. There was discussion. I believe I agree with counsel that there was discussion on the First Amendment based on Mr. Wright, and that's because a First Amendment claim was made in 50A as to Mr. Wright, so it's certainly appropriate that we would discuss that. There are overlapping issues that involve Mr. Leventhal and Mr. Wright, but I would disagree with the argument that just because a discussion was had as of the First Amendment, that somehow that preserves that particular issue. That's part of the reason why we filed a Rule 50A motion, because it doesn't create any confusion. Everyone knows exactly what the issues are. So my position would be that the defendants have waived that right to qualified immunity to the First Amendment and that the Court erred in granting the Rule 50B motion on those particular grounds. So what were the ER pages you were referring to? Pardon me, Your Honor? What were the ER pages you were referring to? The supplemental excerpts of the record where this discussion occurred is tab 68, 35 to 45, through 3547, and tab 68, pages 27, 13. What page of the transcript are those? What page of the transcript? Yes. You're referring to the oral? I'm referring to the oral Rule 50A motion that was made before the Court at the conclusion of the Plaintiff's case in Chief and at the end of the case. It would be 1477 of the transcript. 1477, okay. Okay. You have it in front of you? I have the entire conversation, yes. And your view is that this does not sufficiently raise the – the – I would say, Your Honor, that there's a conversation that says, with respect to Mr. Leventhal, we've discussed prior the Heck Doctrine, a mismatch of allegations, city attorney's office, Mr. Bell, Mr. Leventhal, with respect to select enforcement, there's no evidence who's responsible for filing civil and criminal lawsuits. In fact, the evidence is completely contrary. The plaintiffs rely on, quote, unquote, police, but they haven't given any evidence. That's in a nutshell what our motion is, Your Honor. So my position is that doesn't mention the First Amendment at all, and that doesn't mention qualified immunity. I don't think at any point in the trial there was any discussion of qualified immunity. There wasn't anything until the 50B motion was actually filed that there was actually some kind of argument on behalf of the defendants as to why it was reasonable for the city manager and for the mayor to take the actions that they took. I want to talk – I know the time is running up, and I just was able to get up here, and I wanted to talk about our motion under 50A with respect to Defendant Leventhal and the issue that hasn't been discussed yet, which Ms. Callis talked about, retaliation, and they kind of overlap. But the important issue as far as the select enforcement was this is a class of one claim, and during the point in time where we filed the appeal, there was a case that came out in the circuit called Gerhart v. Lake County. And what that case said was that it's not the action of the actual person. It's not the actions of the city as far as doing something. The rational basis prong of a class of one claim turns on whether there's a rational basis for the distinction rather than the underlying government action. And in this case, what we've said is that in the 50B ruling, the court erred in saying that there was no fences that were shown that were in violation of the fence ordinance that were constructed in a period of time after 1977 and should have been enforced. There was – and I want to give you a couple of examples as quickly as I can. There was an Atwood fence. That fence was a fence that was located within a short period of distance of the pageants. It was a new gate. It was the one that they knew that was constructed after 1977. And it said on the particular permit, it said 6 feet 1 inches. And when the city manager was up on the stand, he was asked, why is this fence not an example of disparate treatment? And his answer was that it was more conforming, that somehow it was closer, and that he was able to make a decision that it was closer. There's another example of a fence that was a Varney fence that was over 8 feet tall, and it was a new gate as well. And the city manager said that he measured it behind the fence because it was to the applicant's benefit that when he measured behind based on the slope, it was less than 6 feet and so it was okay. In addition, I want to talk about the disparate treatment with regard to the pageants. The very fence that the pageants created that was 8 feet tall, as you were discussing, Your Honor, it had 6 feet and then a 2 feet of lattice, that fence was also constructed by the people next door. Their names were the Brains. The Brains had no criminal charges filed against them until a significant time after the pageants had it. And the city took a completely different course of action with the pageants as they did with the Brains. There were 60 criminal counts filed against the pageants, 10 criminal counts filed against the Brains. The fence was up the same amount of time on the pageant side as it was on the Brains. In addition, there's a city code that says that you can only take a civil, criminal, or administrative action against a person who has their fence that's in violation. There was also an e-mail that was presented that was between the city attorney and the city manager where the city attorney asked the city manager, do you want to do civil enforcement, do you want to do criminal enforcement, do you want to do administrative enforcement, or do you want to do nothing at all? And the city manager said, well, as to the one person, I want to do this, but as to the other person, I want to do something else. This idea that there was no evidence on the record that showed that there were fences that were treated disparately between the pageants is not true. And if the Court would like, I can go through those particular portions. You're out of time right now. Thank you.  You deserve about two minutes, I believe. Thank you, Your Honors. And just briefly, the statements of counsel once again ring clear in my mind that it's important that the Court focus on the evidence that's before it and not the argument. I believe that the evidence, which is clearly set forth, will negate any argument that there was selective enforcement with respect to any fences. Do you have any comments on the 50A point, opposing counsel's argument that there was a 50A motion, and it's hard to see where Mr. Langenthal made a 50A motion on the First Amendment? Your Honor, the terminology admittedly was not there. It was the Court asked us to speak very briefly during a lunch break. Boy, that's a sentence only a lawyer would love. Terminology is admittedly not there? Right. What does that mean? It's not there? Is that any different from his job? It's not there? Well, that's right, Your Honor. Okay, so if it's not there, then why doesn't that mean there is no 50A motion, and therefore we review for? Thank you. Because, Your Honor, the Court and the purpose behind Rule 50, and that's what the Court needs to focus on, the purpose behind it. Not the words, the spirit of the rule? Well, Your Honor, the case is directly on point, which talked about the parties need to be on notice of what the deficiencies are. And we pointed out in our brief the district court on a multitude of accounts advising the Padges. They need to point out specifically what it is about these First Amendment equal protection claims that they have any basis that's specifically stated. And in addition to the fact that you had motions eliminated, we had trial briefs on the issue. This was not something that the trial court just brought up on its own. It was something that was specifically alleged and specifically discussed. I have no idea what you're saying. I just don't understand at all. Is what you're saying that it doesn't matter if the motion itself does not address the First Amendment, if the other side's in some way aware that that's an issue, that's enough? Your Honor, they argued it in opposition to our Rule 58 motion. It's in the record. And that saves you from having to list it out in your motion. Your Honor, the court, the cases that we've identified talk about Rule 50 as being an unnecessarily and admittedly a harsh rule. And the cases even talk about the Ninth Circuit case of Reeves talks about the fact that the Rule 50b motion may be satisfied by an ambiguous or an artfully made motion. But you have to you never said First Amendment. I mean, you have to make the motion. I looked. I didn't see where you made it. And you're saying that because it doesn't matter that you didn't actually say it, everybody probably should have known. No, Your Honor. Because everybody did know, not probably should have known. Everyone did know because of the motions eliminated, because of the trial briefs that were filed with this Court, with that Court, dealing with this specific issue and the fact. Okay. So they did know. But I think what I hear, Judge McGee, asking, and what I would like to ask is let's say they all know. But if you don't make a motion, it's sort of like not making an objection at trial. If you don't make an objection, you know, the fact that everybody knows it's hearsay doesn't help you any. So the fact that they know you've got an argument, if you don't make the motion, how does that help you? Well, those are distinguishable, Your Honor, because once again, looking at the cases that I've said. All right. So tell me, if they in fact knew, assuming that they did know, if you didn't make the motion, how does that help you? The motion was made, Your Honor. Well, I'm looking at the language, and I have to agree with Judge McGee. I don't see it here. I see a discussion about First Amendment with regard to right, exactly. But when there's a discussion of Loventhal, there's nothing about the First Amendment. I believe we started out with the Rule 58 oral argument by indicating we were moving You have it? You have the transcript in front of you? I do not have it in front of me, Your Honor. But we started off the argument. Came to court without the transcript. Well, Your Honor, there is the Is that a fact? Yes. That is a fact, because we had three boxes of transcripts. But in looking at that particular transcript, Your Honor Would you like to borrow mine? No, I don't need to, Your Honor. Okay. Well, so you're going to be able to discuss with me what this is? I'm looking at it. Yes, Your Honor, because we moved You can borrow some from opposing counsel. I respectfully do not need to, Your Honor. Okay. So point out to me, language, page, and line number, what it is you're relying on to say that there was a 58 motion? It's stated in my brief, Your Honor. Would you like me to pull that up? No, I'd like you to tell me. Well, Your Honor I'd like you to just tell me. Your Honor, if I may specifically talk at this point I'd like you to tell me. Tell you what, Your Honor? Tell me what it is in the motion. At excerpt of record, tab 1, pages 2886 through 289, Lines? What words are you relying on? Tell me. Your Honor, if I may be I have a transcript. You don't need to tell me where it is. I have it in front of me. I was offering to let you borrow it if you want to actually look at specific words. What specific language are you relying on? I'm relying on the language, Your Honor, that we specifically advised the court at the beginning that we were moving for wolf and deer. Let me just make it perfectly clear. When I say what language I'm relying on, I want something that's in quotes. That's something from the actual motion. Either you can give me the actual words in quotes or you can give me the page of transcript and the line number. Okay? So those are one of those two things. Well, I believe they're before you, Your Honor. As I indicated before, I don't have that particular document with me. Here. Come here. There it is in front of you. So just look it over and tell me where it is. You can then give it back to the clerk once you're done with it. It's the very first line, Your Honor. Read it. Which it's advised that as I indicated to you this morning, both of my clients, Mr. Wright and Mr. Leventhal, hereby make a motion for judgment as a matter of law pursuant to FRCP 50. The plaintiffs have been fully heard on their claims, and both of my clients – against both of my clients, there are legally no sufficient evidentiary basis that a reasonable jury would look at to find for the plaintiffs. That, Your Honor, with respect that there are only two claims as against Mr. Leventhal and one against Mr. Wright, I believe clearly indicates that the First Amendment is in play. So that's the language of the line? Yes, Your Honor. Are you going to discuss the First Amendment as to Mr. Wright? Correct. But you don't discuss as to Leventhal? That is correct, Your Honor. And that is indicated – as I indicated previously, that was merely an oversight given the short amount of time we had to argue. And in looking at the purpose of Rule 50 – That's what waivers are made of, oversights. Sorry? That's what waivers are made of, oversights. But, Your Honor, Rule 50 can't be viewed that – that strictly. And the cases specifically talk about that point. You have to look at what the purpose of the rule is. And the purpose of Rule 50 is to show that the parties have notice of the issues and the deficiencies in the plaintiff's case and to arrive at a just result. To sit here and contend that the Padgett's were not aware that Mr. Leventhal was arguing against the First Amendment is simply not accurate. And that's true for both the Padgett's in looking at their opposition to the Rule 50a motion, both verbally – because orally they actually did talk about it – and in writing. That's your claim? Yes, Your Honor. Okay. Thank you. And do I have time to speak briefly on a couple of the other points? No. Okay. Thank you, Your Honor. Okay. Cases are used and submitted.
judges: Kozinski, Hawkins, Murguia